IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION** |
| *v.* | **NO. 20-297-KSM** |
| **NAFESE KELLY-SIZER.** | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                                                  **April 6, 2021**

Defendant Nafese Kelly-Sizer has been charged with possession of ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1).  (Doc. No. 1.)  He now moves to suppress evidence on which the charge is based, arguing that the firearm and ammunition were obtained by means of an illegal search and seizure.  (Doc. No. 14.)

This Court held an evidentiary hearing on Kelly-Sizer's motion to suppress on March 10, 2021.  (*See* Doc. No. 31.)  During the hearing, Philadelphia Police Department Officers Joshua Kling and Thomas Nestel testified.  Body camera footage and still shots of the vehicle stop involving Defendant were introduced into evidence, as was a Philadelphia Police Department report from the night of the incident.

For the reasons discussed below, the Court denies Kelly-Sizer's motion.

**I.       Factual Background**

On the evening of December 27, 2019, Officers Kling and Nestel were on tactical patrol in the 22nd District.[1]  (*Id.* at 13:2–21.)  At approximately 7:15 p.m., Officer Kling was driving northbound on the 2500 block of North 25th Street when he noticed a vehicle pull out in front of

---

[1] The borders of the 22nd District run from 10th Street to the Schuylkill River, and Poplar Drive to Lehigh Avenue.  (Hr'g Tr. at 13:3–6.)

his police SUV.  (*Id.* at 14:20–23.)  At the intersection of 25th Street and West Huntington, Officer Kling observed the vehicle make a left-hand turn; although the driver slowed down, the vehicle did not fully stop at the stop sign, which is a violation of the Pennsylvania Motor Vehicle Code.  (*Id.* at 14:24–15:3, 16:8–23; Gov't Ex. 1; *see also* Hr'g Tr. at 45:13–17.)

Officer Kling then followed the vehicle onto West Huntington Street and asked Officer Nestel to run the vehicle information through the computer terminal system.  (*Id.* at 16:18–23.)  When Officer Nestel ran the license plate number through the system, nothing came back for the vehicle.  (*Id.* at 45:13–17, 46:3–16.)  Officer Kling testified that this indicated to him that the vehicle either was "in temporary status or that the tag did not belong to the vehicle."  (*Id.* at 17:2–18.)  Officer Kling suspected the latter was true; he could tell the vehicle was most likely not in temporary status because it was missing the half sheet of paper that is normally placed in the rear window of a vehicle when it is in temporary status.  (*Id.* at 17:15–18:4.)

After Officer Kling reached the 2800 block of Huntington, he activated his lights and sirens and pulled over the vehicle.[2]  (*Id.* at 18:5–15; Gov't Ex. 2.)  Officer Kling also turned on the spotlight on the police SUV, which emits a bright white light.  (Hr'g Tr. at 20:8–14.)  Officer Kling observed that there were two individuals in the car, one in the driver seat (Stacy Gallman) and one in the front passenger seat (the Defendant, Kelly-Sizer).  (*Id.* at 19:25–20:7.)  As Officer Kling was exiting the police SUV, he turned on his body camera[3] and witnessed the driver turn

---

[2] During the course of Officer Kling's five-and-a-half years of experience in the 22nd District, he has responded to at least a half a dozen homicides and shootings in a three-block radius of that location, and "a lot more" calls that involved a gun.  (*Id.* at 19:2–21.)  Similarly, during the course of Officer Nestel's four years of experience in the 22nd District, he has responded to calls for shootings, homicides, robberies, and narcotics sales in that location.  (*Id.* at 48:15–49:2.)  Officer Nestel testified that this "absolutely" factors into his thought process while approaching a car in this area.  (*Id.* at 49:3–6.)

[3] However, later on, Officer Kling realized that his body camera was flashing green, meaning it was in standby mode; "[i]t should have been playing already" and flashing red.  At that point, he double tapped it and turned it on.  (*Id.* at 31:3–21.)

his shoulders to the left and reach his right hand across his body, as well as the passenger moving around.  (*Id.* at 20:17–23, 21:7–11, 31:16–21.)  Meanwhile, Officer Nestel observed the passenger "slide down in his seat towards the right." (*Id.* at 50:2–4, 71:19–25.)  This struck Officer Nestel as "unusual," and he testified that in his experience, "often times people that make that movement . . . are trying to put a firearm under the seat of the vehicle," which heightened his level of concern.  (*Id.* at 50:18–51:2.)  Within seconds, Officer Kling approached the driver's side of the vehicle, and Officer Nestel approached the passenger's side.  (*Id.* at 20:24–25, 21:4–6.)

Officer Kling approached the driver, Gallman, and asked for his license, registration, and proof of insurance.  (*Id.* at 22:5–22.)  As a matter of course, Officer Kling also asked whether anyone in the vehicle had a permit to carry a firearm or if there were any weapons in the vehicle.[4]  (*Id.* at 22:22–23:1.)  Gallman responded, "Why?" (*Id.* at 23:14–17.)  Officer Nestel overhead the exchange and thought Gallman's response was "very strange," noting that "the normal answer from a person is yes or no." (*Id.* at 51:9–52:5.)

When Officer Nestel approached the passenger's side of the vehicle, he could see Kelly-Sizer "holding what appeared to be multiple cards in his left hand and reaching with his right hand." (*Id.* at 51:5–8; *see also* Gov't Ex. 6 (still shot from Officer Nestel's body camera, showing a stack of cards in the Defendant's left hand and the Defendant's right hand is blurred because it is in motion).)  Officer Nestel asked Kelly-Sizer for his identification.  (Hr'g Tr. at 52:12–19.)  According to Officer Nestel, Kelly-Sizer responded, "I'm grabbing my ID" and

---

[4] Officer Kling testified that, because hundreds of individuals in Philadelphia have a legal permit to carry, he always asks this question at the outset to prevent a situation from accidentally escalating, in the event he sees a weapon within the vehicle while the occupants are accessing their registration or other documents.  (*Id.* at 22:22–23:13.)

3

continued to reach with his right hand. (*Id.*) This struck Officer Nestel as "strange" because he "could see in [Kelly-Sizer's] left hand a stack of cards" and the "back scannable portion of a driver's license [was] visible[.]" (*Id.*)

Kelly-Sizer was wearing "Dickie" or mechanic-style pants, which have a small slit pocket "along the right lower leg around the mid-thigh area." (*Id.* at 52:12–19, 56:17–25.) Officer Nestel observed the top of a magazine to a Glock[5] firearm poking out of the small slit pocket, and he asked Kelly-Sizer if he had a permit to carry a firearm or a firearm on him. (*Id.* at 53:3–7, 56:3–25; *accord* Gov't Ex. 7 (still shot from Officer Nestel's body camera, showing a bulge in the defendant's pants pocket).) Kelly-Sizer responded, "No, I'm just grabbing my ID" and continued to reach down his right side. (H'rg Tr. at 53:3–7.) At this point, Officer Nestel "believe[d] [Kelly-Sizer] had a firearm," since his ID was visible in his left hand and he reached towards his right-side multiple times. (*Id.* at 57:13–19; *see also id.* at 58:19–24, 58:12–16 ("I thought it was an extremely high safety risk, the fact that he kept saying that he didn't have a firearm and that he was reaching for his ID. I saw the ID, I saw the Glock magazine, [sic] led me to believe that he had a firearm."), 61:8–13, 72:18–23, 73:1–8.)

After seeing the magazine bulge in Kelly-Sizer's pants pocket, Officer Nestel looked up over the vehicle at Officer Kling and said, "Jasper," which is the partners' code word used to alert the other of the presence of a firearm. (*Id.* at 23:18–24:6 (Officer Kling's testimony); *see also id.* at 57:17–25 (Officer Nestel's testimony).) Officer Nestel grabbed Kelly-Sizer's arms,

---

[5] Officer Nestel was able to identify the magazine as Glock because he carries a Glock firearm "every day of [his] life, even off duty" and "the symbol was clearly visible, it's a G with a LOCK in it." (*Id.* at 52:19–53:3; *see also id.* at 57:4–9 (describing the Glock as his "favorite off duty carry weapon," in addition to the firearm he carries at work, and noting that the Glock symbol is printed on the base plate of the magazine and the "base plate was facing me in this situation").)

4

and a back-up officer who had arrived on the scene, Officer Stout, came over to assist him.[6]  (*Id.* at 57:21–25.)

As Officer Nestel was pulling Kelly-Sizer out of the car, Officer Kling saw "the butt of an extended magazine sticking out of Kelly-Sizer's waistband, kind of underneath his hoodie." (*Id.* at 27:22–28:7.)  This prompted Officer Kling to call out to his partner, "Tom, it's in his waistband." (*Id.*; *see also id.* at 62:23–63:3, 73:16–21.)  Officer Kling testified that Kelly-Sizer's hands were pulled up and his jacket "rose up a little bit," giving Officer Kling a view of "the butt of the firearm as well as the magazine." (*Id.* at 28:19–29:4.)

Once Officer Nestel secured Kelly-Sizer in handcuffs, Officer Nestel reached towards Kelly-Sizer's waistband area and "felt an object hit [his] arm."  Officer Nestel testified that he could immediately tell the object was a firearm with an extended magazine, since he carries a firearm and "feel[s] that basically hit [him] on a daily basis." (*Id.* at 63:7–64:4, 92:2–13.) Officer Nestel retrieved the firearm with an extended magazine from Defendant's waist area[7] and

---

[6] When Officer Nestel pulled Kelly-Sizer's arms out of the vehicle, he noticed that the right side of Kelly-Sizer's sweatshirt was "pushed out and off at an angle." (*Id.* at 59:20–60:4.)  Officer Nestel testified that "[i]t looked like the corner of something was poking out of his sweatshirt and that led [him] to believe even more that [the Defendant] had a firearm." (*Id.* at 60:5–9.)

[7] Officer Nestel testified quite adamantly that the gun was "actually somewhat falling out of his waistband." (*See id.* at 64:24–25; *id.* at 66:22–24 ("It was literally falling out of his pants at this point"), 74:18–21, 76:23–77:2; *accord* Def.'s Ex. 3 (report from the night of the incident stating "a gun with an extended magazine fell out of his waistband")).  However, this is not at all apparent from the body camera footage. (*See* Gov't Ex. 12; Hr'g Tr. at 93:24–94:8 (Officer Nestel admitting that "You did not see it falling out, no" when pressed on whether one could see the gun falling out of Kelly-Sizer's waistband in the video).)  Officer Nestel later insisted that the gun "was falling sideways out, so that's why . . . you see me pulling it out sideways." (*Id.* at 94:2–6.)

Furthermore, when repeatedly questioned about where exactly he retrieved the gun from, Officer Nestel testified that he believed he had reached *under* Kelly-Sizer's sweatshirt to the waistband to retrieve the gun, rather than reaching into the sweatshirt pocket. (*See, e.g.*, *id.* at 86:12–20, 87:4–5; *see also id.* at 61:3–4 ("So something was inside his waistband, not physically in the sweatshirt pocket.").)  Although it is difficult to discern from the video whether the firearm was located *in the waistband* underneath Kelly-Sizer's sweatshirt or *at the waist area* inside of the sweatshirt pocket, upon close review of the body camera footage, it appears to this Court that Officer Nestel was actually reaching *into the sweatshirt*

5

the additional Glock magazine from his pants pocket, both of which were fully loaded. (*Id.* at 64:8–25, 68:1–15; *see also* Gov't Ex. 10.)

Meanwhile, Officer Kling also asked Gallman to step out of the vehicle and did a cursory pat down for weapons.[8] (Hr'g Tr. at 31:5–6, 32:17–25.) Officer Kling then passed Gallman to a backup officer, Officer Rosinski, and when Officer Kling returned to the vehicle, he saw a firearm "by the B column,[9] just right next to where" he had seen Gallman "move towards" earlier. (*Id.* at 32:9–16.) Then, a few minutes after Gallman was placed in the back seat of a patrol car, an officer found an extra magazine "dumped" where Gallman was seated. (*Id.* at 33:24–34:11.)

## II.   The Parties' Arguments

In his motion, Kelly-Sizer argues that the Officers lacked reasonable suspicion or

---

*pocket*, located at the waist area, to retrieve the gun. (*See* Gov't Ex. 12.)

However, the Court notes that Officer Nestel's testimony is at odds with the Government's own assertions on this point. In its response brief, *the Government repeatedly stated—no less than 8 times—that Officer Nestel had reached into the Defendant's sweatshirt pocket to retrieve the gun.* (*See* Doc. No. 19 at p. 3 ("As the defendant shifted in the seat, Officer Nestel saw the butt of a firearm protruding *from the defendant's sweatshirt pocket*; he noted that it appeared to be connected to a large bulge *in the defendant's sweatshirt pocket*." (emphasis added); *id.* at p. 4 ("When Officer Nestel removed the defendant from the car, he recovered a Polymer 80, model PF940C, .40 caliber semiautomatic pistol, with no serial number, loaded with 21 live rounds, *from the defendant's sweatshirt pocket*[.]" (emphasis added)); *id.* at p. 5 ("Officer Nestel saw an extended magazine protruding *from the defendant's sweatshirt pocket*" (emphasis added)); *id.* at p. 8 ("While Officer Nestel was securing the defendant's hands, he saw what he immediately recognized as the butt of a firearm protruding *from the defendant's sweatshirt pocket*. Officer Nestel removed the defendant from the car and pulled the gun *from the defendant's sweatshirt pocket*." (emphasis added)); *id.* at p. 9 ("Here, Officer Nestel was lawfully securing the defendant *when he saw the firearm in his sweatshirt pocket*, thus he properly recovered the firearm." (emphasis added)); *id.* ("Officer Nestel saw a portion of a gun *in the defendant's sweatshirt pocket*." (emphasis added)).

[8] Officer Kling testified that he "wasn't looking for anything besides another firearm that might have been in [Gallman's] waistband. So I would've gone along his belt line, up down his arms, but I wouldn't be doing it for anything more." (*Id.* at 33:24–34:6; *see also id.* ("I didn't do a like a pat down or a frisk of him, I didn't go through his pockets, nothing like that.").)

[9] Officer Kling testified that "the B column would be where your seatbelt would be attached to." *Id.* at 26:14–15.

6

probable cause for conducting the initial stop, when they pulled over Gallman's car, and that the Officers also violated Kelly-Sizer's right to be free from unreasonable searches and seizures when they searched his person and arrested him. (Doc. No. 14 at pp. 2–3.) In addition, Kelly-Sizer contends that subsequent to his arrest, any statements he made to members of the Philadelphia Police Department were improperly obtained and violated his rights under the United States Constitution and *Miranda v. Arizona*. (*Id.* at p. 4.)

In response, the Government argues that the Officers had reasonable suspicion to conduct the stop because Gallman failed to fully stop at a stop sign, a violation of the Motor Vehicle Code, and that the Officers had reasonable suspicion to believe that Kelly-Sizer was armed based on the circumstances of the stop and in particular, the Glock magazine that was visible in Kelly-Sizer's pants pocket. (Doc. No. 19 at pp. 5–9.) The Government also asserts that the Officers had probable cause to arrest Kelly-Sizer and that the statements Kelly-Sizer made on the scene were not illegally derived. (*Id.* at pp. 7–15.)

At the evidentiary hearing, Kelly-Sizer withdrew the following arguments: first, that the initial stop was unlawful and that the Officers lacked reasonable suspicion that a motor vehicle violation had been committed, and second, that statements Kelly-Sizer made at the scene were illegally obtained. (Hr'g Tr. at 6:24–7:11.) As such, Kelly-Sizer's only remaining argument is that the Officers' search of his person and his subsequent arrest were unlawful. (*Id.* at 7:12–13.)

### III.   Standard of Review

As a general matter, a defendant who moves to suppress evidence bears the burden of proof. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). "However, once the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable."

7

*Id.*; *see also United States v. Cole*, 425 F. Supp. 3d 468, 484 (W.D. Pa. 2019) ("The defendant's burden is easily satisfied when law enforcement conducted the challenged search or seizure without a warrant."). The government must satisfy its burden of proof by a preponderance of the evidence. *See, e.g.*, *Cole*, 425 F. Supp. 3d at 484.

### IV.     Discussion

#### A.   *The Stop*

Although Kelly-Sizer has withdrawn his argument that the stop was unlawful, the circumstances surrounding the stop provide context for his later arguments that the search of his person and his arrest were unlawful. Therefore, as a preliminary matter, the Court will briefly review the law and facts related to the initial traffic stop.

The Fourth Amendment protects people against unreasonable searches and seizures. U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012) (quoting *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002)). It is well-settled that a traffic stop is a "seizure" under the Fourth Amendment. *See, e.g.*, *United States v. Johnson*, 452 F. App'x 219, 225 (3d Cir. 2011). As the Third Circuit has explained, the Supreme Court established a "bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for the investigation of some other crime." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)). The reasonable suspicion standard applies to routine traffic stops. *Johnson*, 452 F. App'x at 225.

Because "*any* technical violation of a traffic code legitimizes a stop," *Mosley*, 454 F.3d 252 (emphasis added) and failure to make a complete stop at a stop sign is a violation of 75 Pa.

C.S.A. § 3323, Officers Kling and Nestel had reasonable suspicion to conduct the traffic stop. *See, e.g.*, *United States v. Cann*, Criminal Action No. 16-309, 2017 WL 1739562, at *3 (E.D. Pa. May 3, 2017) (concluding that the initial traffic stop was lawful under the Fourth Amendment, where the vehicle in which the defendant was a passenger was stopped for two traffic violations, the first being that the driver failed to obey a stop sign); *United States v. Oritz*, Criminal Action No. 16-129, 2016 WL 5661712, at *2 (E.D. Pa. Sept. 30, 2016); *United States v. Wolford*, No. CR. 08-29, 2010 WL 4363871, at *6 (W.D. Pa. Oct. 27, 2010).

Moreover, prior to initiating the traffic stop, the Officers ran the license plate number, but there was no vehicle registration associated with the vehicle, also a violation of the Motor Vehicle Code, *see* 75 Pa. C.S.A. § 1301(a) (prohibiting driving an unregistered vehicle); *United States v. Mundy*, 621 F.3d 283, 289 (3d Cir. 2010), providing yet another basis for the traffic stop, *see, e.g.*, *United States v. Mosley*, No. CR.A. 01-664, 2002 WL 32351168, at *2 (E.D. Pa. Sept. 18, 2002).

### B. The Search and Seizure

As "[t]he Supreme Court has repeatedly recognized," "traffic stops are dangerous encounters that result in assaults and murders of police officers." *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (citations omitted). It is well-settled that a police officer executing a valid traffic stop "may exercise reasonable superintendence over the car and its passengers." *Bonner*, 363 F.3d at 216. Thus, after a car has been legally stopped, "the police may 'escalate' the encounter by visually inspecting the interior of the car, and checking credentials and asking questions of the occupants." *Mosley*, 454 F.3d at 252.

As a preliminary matter, Officers Nestel and Kling were permitted to question Kelly-Sizer and order Kelly-Sizer out of the car. *See, e.g.*, *United States v. Yamba*, 407 F. Supp. 2d

9

703, 708 (W.D. Pa. 2006), *aff'd*, 506 F.3d 251 (3d Cir. 2007) (explaining that two Supreme Court cases, *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) and *Maryland v. Wilson*, 519 U.S. 408 (1997), "demonstrate that a police officer may order the driver and passengers to exit the vehicle while the stop is being conducted").

Moreover, a police officer "may pat down the occupants of the vehicle and conduct a search of the passenger compartment, if he has a reasonable suspicion that the occupants might be armed and dangerous." *Bonner*, 363 F.3d at 216; *see also United States v. Colen*, 482 F. App'x 710, 711 (3d Cir. 2012) ("[W]here—as here—police conduct a valid traffic stop[,] they may conduct a limited search for weapons by patting-down the driver and/or occupants of the stopped vehicle for their own protection."); *United States v. Goode*, 486 F. App'x 261, 264 (3d Cir. 2012) ("[T]he police only needed a reasonable suspicion that they were dealing with an armed and dangerous individual to permit a reasonable search for weapons." (quotation marks and citations omitted)); *Yamba*, 407 F. Supp. 2d at 708 ("Moreover, the Court of Appeals for the Third Circuit has recognized that . . . many courts of appeals have upheld limited weapon pat-downs of passengers where the passengers have engaged in suspicious behavior." (citation omitted)).

The officer must be able to identify "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Moorefield*, 111 F.3d at 11 (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). In assessing whether reasonable suspicion exists, this Court must consider the totality of the circumstances (i.e., the whole picture). *See, e.g.*, *Colen*, 482 F. App'x at 712; *Goode*, 486 F. App'x at 264. The Third Circuit has recognized that "[c]ourts give considerable deference to police officers' determinations of reasonable suspicion." *Mosley*, 454 F.3d at 252.

Here, Officers Kling and Nestel identify "specific and articulable facts which, taken together with rational inferences from those facts," show that the officers had reasonable suspicion to believe an occupant in the vehicle was armed and dangerous. First, the officers testified that, based on their years of experience, they had personal knowledge that the location of the stop (i.e., where they pulled Gallman and Kelly-Sizer over) was in a high-crime area. (*See* Hr'g Tr. at 19:2–21 (Officer Kling's testimony), *id.* at 48:15–49:6 (Officer Nestel's testimony).) Second, the officers' concern was heightened when, prior to approaching the vehicle, they saw Gallman turn his shoulders to the left and reach his right hand across his body, and Kelly-Sizer slide down in his seat towards the right. (*Id.* at 20:17–23, 21:7–11, 31:16–21 (Officer Kling's testimony); *id.* at 50:2–4, 71:19–25 (Officer Nestel's testimony).) Kelly-Sizer's movements amplified Officer Nestel's concern because, in his experience, "often times people that make that movement . . . are trying to put a firearm under the seat of the vehicle." (*Id.* at 50:18–51:2.)

Third, Gallman responded "Why?" when asked whether he had a license to carry or if there were any weapons in the vehicle, which differed from the typical "yes or no" answer to this routine question. (*Id.* at 22:22–23:1–17 (Officer Kling's testimony); *id.* at 51:9–52:5 (Officer Nestel's testimony).) Fourth, Officer Nestel noticed a bulge in Kelly-Sizer's pants slit pocket, and then recognized the symbol for the Glock firearms manufacturer.[10] (*Id.* at 52:12–53:3, 53:3–

---

[10] The plain view doctrine also applies to the seizure of the magazine from Kelly-Sizer's pants slit pocket. Under the plain view exception to the warrant requirement, police may lawfully seize contraband without a warrant if they "are lawfully in a position from which they view [the] object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "If, however, the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object— i.e., its incriminating character is not immediately apparent—the plain-view doctrine cannot justify its seizure." *Id.* Here, Officer Nestel has credibly testified that he could see the base plate of the magazine containing the symbol for the Glock manufacturer in Kelly-Sizer's slit pocket while outside of the passenger's side window (i.e., the bulge's incriminating nature was immediately apparent from Officer Nestel's lawful position).

11

7, 56:3–25, 57:4–9.) Fifth, Kelly-Sizer contradicted himself when he stated that he was just grabbing his ID with his right hand while he was visibly holding a stack of cards, including an ID, in his left hand. (*Id.* at 51:5–8, 52:12–19; *see also* Gov't Ex. 6.) Sixth, Officer Kling saw a firearm visibly poking out from Kelly-Sizer's waist area as Officer Nestel pulled Kelly-Sizer out of the vehicle. (*See* Hr'g Tr. at 27:22–29:4; *see also id.* at 62:23–63:3, 73:16–21). Again, Officer Kling's observation of the firearm was in plain view. (*See supra* n.8).

During the hearing, Defendant's counsel focused heavily on the fact that the gun was retrieved when Officer Nestel reached his hand into Kelly-Sizer's sweatshirt pocket. To the extent that Defendant's counsel asserts that this action violated Kelly-Sizer's Fourth Amendment rights, the Court disagrees. First, as illustrated by the caselaw cited above, an officer may conduct a limited search for weapons on a passenger during a traffic stop if the officer can point to specific articulable facts indicating that he reasonably believed the passenger was armed and dangerous, and, as enumerated above, we find that was undoubtedly the case here. After Officer Nestel saw the bulge in Kelly-Sizer's pocket, at which point it was apparent to him that the object poking out of the pocket was an extended magazine, he had more than sufficient reasonable suspicion to conduct a pat-down.[11]

Second, it is of no moment that Officer Nestel reached into Kelly-Sizer's pocket to retrieve the firearm. This is so because Officer Nestel could lawfully pat-down Kelly-Sizer, and he felt the firearm while doing so. In *Minnesota v. Dickerson*, the Supreme Court explained that the plain view doctrine "has an obvious application by analogy to cases in which officers discover contraband through the sense of touch during an otherwise lawful search." 508 U.S. at 375. The Court reasoned:

---

[11] Officer Kling's observation of the firearm in Kelly-Sizer's waist area adds to the already sufficient reasonable suspicion.

12

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* "As in plain view situations, the seizure is constitutionally permissible because where the contraband's nature is immediately apparent, the seizure is supported by probable cause." *Yamba*, 407 F. Supp 2d at 709–10. "Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." *Dickerson*, 508 U.S. at 376.

In *United States v. Yamba*, the defendant argued that his Fourth Amendment rights were violated when, during a pat-down, the police officer reached into his pocket and seized a plastic bag of marijuana. 407 F. Supp 2d at 710. The district court disagreed and denied the defendant's motion to suppress, reasoning that because the pat-down was lawful under *Terry v. Ohio,* and the plain touch or feel exception applied, the seizure was lawful. *Id.* at 710–15. The Third Circuit affirmed. *See* 506 F.3d at 253. In holding that the seizure was lawful, the district court explained that during the pat-down, "it became immediately apparent to [the officer] that the plastic bag he touched contained a substance that, from his knowledge, training, and experience, he 'knew' to be marijuana." 407 F. Supp 2d at 711; *see also id.* at 715 ("In the course of a protective patdown of Yamba, Livingstone felt something which he immediately recognized as contraband. At that point, it was not merely permissible, but proper for him to remove and inspect further the plastic bag that he 'knew' contained marijuana.").

The same logic applies here. When Officer Nestel went to retrieve the firearm from Kelly-Sizer's waistband area—where his partner indicated he visually observed the firearm—

13

Officer Nestel felt the firearm.  At this point, given his training and experience, it became immediately apparent to Officer Nestel that the object was a firearm.  Officer Nestel lawfully retrieved the firearm from Kelly-Sizer, regardless of whether the firearm was located in Kelly-Sizer's sweatshirt's center waist pocket or in his waistband.

Relatedly, Kelly-Sizer argues that we should grant his motion to suppress because Officer Nestel's testimony is not credible.  (*See, e.g.*, Hr'g Tr. at 96:24–92:2 ("I know that the officer testified to such.  But you cannot, as you know, take that particular testimony in a vacuum and not also consider other testimony he gave.").)  In so arguing, Kelly-Sizer relies on the inconsistency between the testimony that the firearm was in Kelly-Sizer's waistband and the video footage, which appears to show that the gun was actually retrieved from inside of Kelly-Sizer's sweatshirt pocket.  (*See, e.g.*, *id.* at 96:19–98:20.)  And defense counsel admits that "Your Honor is correct, if [the officer], in fact, saw this magazine sticking out as he says of the pocket, I would submit that that would be probable cause." (*Id.* at 97:13–16.)  According to Kelly-Sizer, his suppression motion hinges on the officers' credibility.

The body camera footage does not show the firearm falling out of Kelly-Sizer's waistband.  Nor does the footage appear to support Officer Nestel's testimony that he retrieved the gun from Kelly-Sizer's waistband, as opposed to inside his sweatshirt pocket.  (*See supra* n.6.)  Nonetheless, the Court disagrees with defense counsel's assessment that this renders Officer Nestel's testimony not credible.  As the Third Circuit has acknowledged, albeit in a non-precedential opinion, "police video should only be considered as one piece of evidence in making a factual determination, and the fact that a video may not fully support the testimony of a police officer is not necessarily grounds for finding the officer's testimony as not credible." *See United States v. Forehand*, 386 F. App'x 174, 177 (3d Cir. 2010) (affirming district court's

finding that the officer's testimony was credible as to the facts surrounding the traffic stop and subsequent frisk of the defendant, even though the video "recording does seemingly fail to support [the officer's] testimony on several issues"). Here, Officer Nestel's testimony otherwise largely aligns with the video footage. For example, still shots of the video footage and the video footage itself show that there is a bulge in Kelly-Sizer's pocket and that Kelly-Sizer is holding cards, including one that appears to be an identification card, in his left hand as Kelly-Sizer claims to be reaching for his identification with his right hand.

Officer Nestel testified that: (1) he observed a bulge in Kelly-Sizer's pants slit pocket and recognized the symbol for the Glock firearms manufacturer on the base of the magazine; (2) he believed Kelly-Sizer was armed because of his suspicious behavior, including the fact he was reaching towards his right side, claiming to be grabbing his ID, despite the fact that he appeared to have his ID in his left hand; (3) he called the code word to alert his partner of the presence of a firearm; and (4) he felt the extended clip of a firearm when he reached towards Kelly-Sizer's waist area. The Court finds this testimony credible.

### C. *The Arrest*

Last, Kelly-Sizer contends that his constitutional rights were violated when he was arrested. We disagree.

"A warrantless public arrest does not violate the Fourth Amendment 'where there is probable cause to believe that a criminal offense has been or is being committed.'" *United States v. Johnson*, Criminal Action No. 05-440, 2007 WL 2916157, at *4 (E.D. Pa. Oct. 5, 2007) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004)); *see also United States v. Reid*, 185 F. App'x 208, 210–11 (3d Cir. 2006) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe

15

an offense has been committed."). "To determine whether an officer had probable cause to arrest an individual, a court must 'examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Johnson*, Criminal Action No. 05-440, 2007 WL 2916157, at *4 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

Here, we conclude that Officer Nestel had probable cause to arrest Kelly-Sizer when he saw the firearm. *See United States v. Bond*, 173 F. App'x 144, 146–47 (3d Cir. 2006) (affirming defendant's § 922(g)(1) conviction and the district court's denial of the defendant's motion to suppress, and holding that the officers had probable cause to arrest the defendant as soon as they "observed [him] in possession of a firearm on a public street in Philadelphia").

**V.   Conclusion**

For the foregoing reasons, the Court denies Kelly-Sizer's motion to suppress.

An appropriate Order follows.